IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:22-CR-154 |
| TARRY JERON "TJ" WILSON, | |
| Defendant. | |

<u>GOVERNMENT RESPONSE TO THE COURT'S ORDER OF NOVEMBER 22, 2022</u>

On October 21, 2022, this Court directed that defendant Wilson be evaluated for competency to stand trial. On November 22, 2022, this Court directed the parties to notify the Court whether it is necessary to hold a competency hearing on November 28, 2022, and, if a hearing is necessary, to file memoranda stating their positions by November 25, 2022. It is, in fact, necessary to hold such a hearing.

 "Reasonable cause" exists to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. When such "reasonable cause" exists, the Court is required by 18 U.S.C. § 4241(a) to hold a competency hearing (regardless of whether either party moves for one). *United States v. Banks,* 482 F.3d 733, 742 (4th Cir. 2007) (while the existence of "reasonable cause" is left to the discretion of the trial court, the existence of reasonable cause requires the ordering of a competency hearing). In this case, "reasonable cause" exists, so a competency hearing must be held.

If, after the competency hearing, the Court finds by a preponderance of the evidence that the defendant is mentally incompetent, the court must commit the defendant to the custody of the Attorney General so that the defendant can be hospitalized for a period of time to determine "whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward." *Id*. § 4241(d)(1).  At the competency hearing, it is the defendant who bears the burden of proving his mental incompetency. *United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005).

On the night of November 24, 2022, Wilson's counsel emailed government counsel a copy of the report of the evaluator, Licensed Clinical Psychologist Kevin McWilliams.[1]  Counsel for the United States has had no contact with McWilliams.

McWilliams concluded that Wilson is not competent to stand trial.  We question the reliability of the procedures used by McWilliams.  For his evaluation, McWilliams relied on the representations of Wilson and his girlfriend, but did not examine any of the evidence collected in the case  - - including the myriad statements made by Wilson to other dogfighters on what Wilson believed was a private encrypted Telegram group, and long conversations with another dogfighter that Wilson did not know were being overheard by government agents.  Those communications depict Wilson's competency far more accurately than did the limited universe of self-serving statements considered by McWilliams.

Inasmuch as Wilson knew that the representations that he made to McWilliams in 2019 sufficed for McWilliams to find Wilson incompetent to face a drug trial in Virginia state court at that time - - and for the state charges against Wilson to be dropped - - Wilson and his girlfriend possessed significant incentives to make the same representations today.  The communications

_____

[1]  That report was filed on the docket earlier this morning.

by Wilson between 2016 and 2020 that were collected by the government, however, tell a much different story.

Undersigned counsel are not licensed clinical psychologists, but still suspect that a more accurate picture of Wilson's mental abilities could be gleaned from listening to the hours of conversations between Wilson and his dogfighting colleagues that were recorded without Wilson's knowledge in 2018 and 2019, and reading the posts to the DMV Board and text messages that were captured between 2016 and 2020. Those conversations and communications reflect Wilson's obvious abilities to understand the illegal nature of his actions and those of his conspirators – which abilities themselves suggest that he has the ability to understand the charges against him and participate in his own defense today. For example:

    a.   At times, it was Wilson who was the manager of the DMV Board on the Telegram App. Exhibit 1 to this pleading consists of text messages between Harvey and Wilson in July 2018, reflecting Harvey's direction to Wilson to take down the Board on the Telegram app. The text messages reflect that, after Harvey told Wilson that Harvey's property was searched and his dogs seized, Wilson asked whether the investigators were state or federal, and advised Harvey that the government needed a warrant to take his dogs. Exhibit 2 to this pleading consists of DMV Board texts from March 2017, reflecting Norman's direction that, in light of the arrest of one of their fellow dogfighters, Wilson should delete messages from the DMV Board.

    b.  Wilson manifested the ability to arrange fights for his dogs months in advance, at particular weights and at specified locations - - as well as to plan out and follow rigorous training regimens in preparation for those fights. Exhibit 3 to this pleading consists of text messages between Wilson and Harvey, between November 14, 2018, and January 19, 2019, regarding Wilson's preparation of his dog for a fight in Delaware on January 19, 2019.

        Exhibit 4 to this pleading consists of an evidence log and photos of the Ivermectin, Nemex, Trazodone, Dexamethazone, Lupin, Albon, and other medications, supplements, and training logs for dog fighting that investigators seized at Wilson's residence in August 2020.

    c.  Wilson manifested the ability to dispute with other dogfighters his right to collect forfeit fees when his opponent failed to make weight requirements for their own dogs at the time specified months earlier. Exhibit 5 to this pleading

3

is the transcript of a portion of a call between Wilson and Harvey on January 10, 2019, reflecting Wilson's dispute with another dogfighter regarding Wilson's right to collect a forfeit fee because the other dogfighter was not ready with a dog at the right weight at the specified time.

d.  Because of concerns that dogfights might be infiltrated by government agents, dogfighters often negotiate limitations on how many "guests" each party may bring to a dogfight.  Wilson selected the particular conspirators who would accompany him to out-of-state fights, and arranged how they would meet up and travel to the scene of the fight. Exhibit 6 to this pleading is the transcript of a portion of a call between Wilson and Harvey from January 15, 2019, reflecting Wilson's plan to drive to Woodbridge, Virginia, on January 19, 2019, to meet "Fatal Attraction", and then drive to Delaware with Fatal "Attraction" - - but in separate cars, because "Derek" did not want to travel in a car in which Wilson would be smoking.

e.  Wilson knew that dogfighting was illegal, and repeatedly warned his fellow dogfighters about how loose talk and posts could lead to being caught. Exhibit 7 to this pleading contains a selection of posts (by and relating to Wilson) to an on-line group known as the "Scratch Dog Journal," between December 2016 and March 2020. Page 6 of the "Scratch Dog Journal" includes a post by Wilson from November 27, 2017, which essentially consisted of his warning to other dogfighters to avoid putting on Facebook details of fights (such as '35 min 2xw killen in box') because police watch Facebook, and track dogfighters' phones and computers.  He wrote "everything dey know when u get online!!" As seen on Page 3 of those same excerpts, Wilson repeated that warning on March 6, 2020 ("Ppl get locked up off fb every week!! BE SMART").

Exhibit 8 to this pleading is the basis for Overt Act 74 of the Indictment.  That act alleged that, in response to a news article posted to the DMV Board on or about January 17, 2019, regarding an individual charged with running a dogfighting operation, Wilson warned "People like dogs.  They don't like what we doing to them, though, I bet you that."

Based on the McWilliams report, one would never suspect that Wilson could do any of these things.  In fact, however, he did. . . .

The conclusions reached by McWilliams apparently were reached upon the basis of representations made by Wilson and his girlfriend that were made in the knowledge that the same representations had enabled him to avoid the consequences of a state narcotics charge in 2019.  It is difficult for a non-psychologist to fathom how an accurate evaluation could be made

4

without considering the communications made by Wilson *outside* the presence of the psychologist or government agents. *See, e.g., United States v. Gigante,* 166 F.3d 75, 84 (2d Cir. 1999) (affirming the district court's conclusion that Mafia crime family leader Vincent "the Chin" Gigante "had put on a "crazy act" for many years in order "to avoid apprehension by law enforcement").

The McWilliams report also is undermined either by its author's misunderstanding of the factual context of this case, or an inexcusable dismissal of the significance of the criminal conduct in which Wilson engaged from before he was shot to at least August 2020. McWilliams concludes his report with the words, "Of note, Mr. Wilson is not considered a risk of harm to himself or others in the community (his cognitive deficits do not limit him in that regard)." Inasmuch as Wilson continued to engage in dogfighting after he was shot - - and even continued to do so after he was evaluated as incompetent to stand trial on drug charges in 2019, that consideration is entitled to no weight. To the contrary, it flies in the face of very disturbing facts.

Wilson's criminal activity continued long after McWilliams first found him incompetent in 2019. For example, in the course of the state search warrant for drug evidence that was executed at Wilson's residence in June 2019, investigators seized Wilson's phones. Exhibit 9 is a selection of chats on the DMV Board that were found in 2020 on the phone in that Wilson obtained *after* June 2019 (and that was seized from him in connection with the federal dogfighting search warrant executed in August 2020). These chats reflect the description of dog fights involving Wilson's dogs in June 2020 (note that "City Limits" is Wilson' dogfighting name):

> City Limits Kennel's Thor into Dog Father Kennel's Tank Top Shorty both first time out at 47lbs M.
> Thor comes in at 47lbs 1oz and Tank Top Shorty comes in at 46lbs 9oz.

> At 16 minutes Tank Top Shorty quits by slowing walking over and stopping two
> feet to the right of the other dog, not moving and looking around.
> Thor completes his courtesy scratch.
> Winner is City Limits Kennel's Thor 1xw.
>
> City Limits Kennel's Red Alert (Condition and Handled by Fatal Attraction) into
> Tap Out[2]
> Kennel's Pretty Girl both first time out at 33lbs 8oz.
> Red Alert comes in at 33lbs 13oz and Pretty Girl comes in at 33lbs 15oz.
> At 32 minutes Pretty Girl quits standing on all fours and not moving.
> Red Alert completes her courtesy scratch.
> Winner is City Limits Kennel's Red Alert 1xw.

We suspect that knowledge that Wilson not only continued to fight dogs after he was evaluated

as incompetent to stand trial on drug charges in 2019, but also provided one of his dogs to a

friend to do the same thing, would affect a reliable conclusion as to whether such patient posed a

risk of harm to himself or others in the community.

Exhibit 10 is a transcript of statements Wilson made on the encrypted Telegram app, on

or about October 16, 2018, in response to a statement by another dogfighter (West) that West

would have loved to have killed a third dogfighter's dog for losing a fight, but that such third

dogfighter lived too far away for West to make the trip to kill the dog.  In response, Wilson said:

> Hey, he should have invited me over there.  He knows I would love to put those
> motherfuckers to sleep.  I love that shit like a motherfucker, man.  *It's like I'm
> killing somebody, man.*  I'll unplug it and hook them up.  Unplug it and hook
> them up. I like killing motherfuckers.  Them motherfuckers taking my money,
> feeding them food, taking my antibiotics and in my yard taking my deck.
> Motherfuckers.

(emphasis added).[3]  Further, Exhibit 11 depicts a dog hooked up for electrocution through a car

battery.  Exhibit 11 is a screenshot of one of the many videos of Wilson's involvement in

dogfighting that were found on the phone that Wilson obtained *after* June 2019.

---

[2]  The indictment alleges "Fatal Attraction" to be Derek Aaron Garcia.

[3]  We believe that "unplug it and hook them up" refers unplugging a car battery from the
car starter, and then hooking the battery to the unfortunate dog.

The action described by Wilson in Exhibits 10 and 11 were no anomaly; Exhibit 12 is a transcript of a discussion on the DMV Board in which Wilson described how he ended up shooting the dog that lost the fight in Delaware on January 19, 2019.  As he explained it, after the dog quit the dog fight, she thwarted his efforts to electrocute her by hooking her up to a car battery, so he took out his gun and shot her:

> Man, that bitch run to the opposite side of the box and tried to jump out.  I said "she had enough, she had enough.  I said "hey nigger, hang that bitch.  Hang that bitch!"  Then we tried to put a jump box on her.  She ain't die.  Man, we shot that bitch three times.  She ain't want to die.  Motherfucker shit in the box.  Tried to jump out of the box.  Hey, I shot her; pulled my gun out and shoot that motherfucker.  That was - - there was - - they was blowing smokes and shit, so I ain't kill her.  I want to do it.

We suspect that reputable psychologists would agree that, where the patient was himself shot in 2015, knowledge of such patient's repeated use of firearms to kill dogs after dogfights in 2018 and 2019 would be relevant to a determination of whether such patient was a risk of harm to himself or others in the community in 2022.  Further, we suspect that reputable psychologists would agree that knowledge of such patient's expression of pleasure in killing would be relevant to a conclusion of the danger to the community that is posed by such patient.

In short, there is no justification for the conclusion by McWilliams that "Mr. Wilson is not considered a risk of harm to himself or others in the community."  The failure of McWilliams to consider what Wilson said to his fellow dogfighters (when he thought no one from the government was listening) undermines any such conclusion that McWilliams based on the statements that Wilson (and his girlfriend) made to McWilliams himself (or others that were known by Wilson to be government agents).  To the contrary, the defendant interpreted the dismissal in 2019 of the narcotics charges that had been lodged against him to constitute a "get

out of jail free" card, to be used when he might be charged for the illegal conduct that he continued to pursue before and after his 2015 shooting.

That said, pursuant to 18 U.S.C. § 4241(d), a defendant found by a preponderance of the evidence to be not competent to stand trial *shall* be committed to the custody of the Attorney General, and the Attorney General *shall* hospitalize the defendant in a suitable facility to see if the defendant's competency can be restored.  In light of the conclusions reached by McWilliams, the United States does not oppose the committal of the defendant to the custody of the Attorney General for hospitalization in a suitable facility to see if the defendant's competency can be restored.

In *United States v. Shawar*, 865 F.2d 856, 860 (7th Cir. 1989), the Seventh Circuit concluded: "The plain meaning of this phrase [shall commit] is, and we hold it to be, that once a defendant is found incompetent to stand trial, a district judge has no discretion in whether or not to commit him."  Indeed, § 4241(d) imposes a mandatory duty to commit a defendant who is found incompetent to the custody of the Attorney General, "even if there is undisputed medical evidence that the defendant cannot be restored to competency."  *United States v. Dalasta,* 856 F3.d 549, 553 (8th Cir. 2017).   *Accord United States v. Quintero*, 995 F.3d 1044, 1050 (9th Cir. 2021) ("We hold that § 4241(d) mandates that district courts commit mentally incompetent defendants to the custody of the Attorney General for treatment, without discretion for the court to order a particular treatment setting."); *United States v. McKown,* 930 F.3d 721 (5th Cir. 2019) (same).

To be sure, the evaluation made by McWilliams is not the final word on the subject of Wilson's competence.  As the Fifth Circuit wrote in *McKown:*

> Nevertheless, the brief interviews and review of medical records that tend to
> characterize the initial competency proceeding are generally insufficient to

> provide a careful and accurate diagnosis.  On account of the limitations on the
> federal courts in the field of mental health, the statute reasonably permits a
> more thorough evaluation before the district court must decide whether to
> defer trial indefinitely and (quite often) to release the defendant back into
> society.  To be sure, the miracles of science suggest that few conditions are
> truly without the possibility of improvement.

*McKown,* 930 F.3d at 729 (internal quotations and citations omitted).  *See United States v.*

*Filippi*, 211 F.3d 649, 651–52 (1st Cir. 2000) (finding commitment under § 4241(d)

constitutional even where the defendant's condition was irreversible, explaining that "Congress

could reasonably think that, in almost all cases, temporary incarceration would permit a more

careful and accurate diagnosis before the court is faced with the serious decision whether to defer

trial indefinitely and (quite often) to release the defendant back into society").

The basis of the McWilliams evaluation is weak.  Nevertheless, the United States does

not oppose the committal of the defendant to the custody of the Attorney General for

hospitalization in a suitable facility for a more fulsome examination of the defendant's

competency  - - and to see, if he is in fact not now incompetent, his competency can be restored.

Respectfully Submitted,

Jessica D. Aber
United States Attorney

By:          /s/
Cristina C. Stam
Gordon D. Kromberg
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
Email: gordon.kromberg@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 25, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record.

_____/s/_____
Gordon D. Kromberg
Assistant United States Attorney